Marzuq A. AL–HAKIM

v.

**STATE OF FLORIDA, et al.**

**Civ. A. No. 88–1416–T–23C.**

United States District Court,
M.D. Florida,
Tampa Division.

July 5, 1995.

Marzuq A. Al–Hakim, Tampa, FL, pro se.

John J. Dingfelder, Patricia Lynn Cash, Hillsborough County Attorney's Office, Tampa, FL, Harry Frazier Chiles, George Lee Waas, Atty. General's Office, Dept. of Legal Affairs, Tallahassee, FL, and Mark A. Petche, 13th Judicial Circuit Court Counsel's Office, Tampa, FL, for defendants.

### ORDER

NEWCOMER, District Judge.

AND NOW, this 29th day of June, 1995, upon consideration of the Report and Recommendation of Magistrate Judge Elizabeth A. Jenkins, and the objections of plaintiff thereto, it is hereby ORDERED that the Report and Recommendation is APPROVED and ADOPTED.

IT IS FURTHER ORDERED, consistent with the Report and Recommendation, that:

1. Defendants' motion to strike is DENIED;

2. Defendants' motion for summary judgment is GRANTED;

3. Plaintiff's motion for summary judgment is DENIED;

4. Plaintiff's motion for judgment on the pleadings is DENIED; and

5. Judgment is ENTERED in favor of defendants and against plaintiff.

This case was brought by plaintiff to challenge the existing at-large system of electing county and circuit judges in Hillsborough County, Florida. The essence of plaintiff's claim is that the at-large system is discriminatory in that it deprives blacks and other minorities of the right to fully participate in the electoral process by diluting their voting strength. He contends that white voters can vote as a unit to control elections, and also that the at-large system was designed with discriminatory intent.

The case was presented to the Court on motions for summary judgment, and the motions were referred to Magistrate Judge Jenkins for preparation of a Report and Recommendation. Magistrate Judge Jenkins recommends entry of judgment for the defendants. Plaintiff has filed objections to this recommendation. Those objections will be addressed here.

The plaintiff does not pose objections to the legal standards set forth by Judge Jenkins. Judge Jenkins analyzed this case under the three prong test of *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). The three *Gingles* prongs are as follows: 1) the minority group must demonstrate that it is sufficiently sizeable and geographically compact to constitute a majority in a single-member district, 2) the minority group must demonstrate that it is politically cohesive, and 3) the minority group must demonstrate that the white majority votes sufficiently as a bloc to defeat the minority's preferred candidate. *Id.* at 50–51, 106 S.Ct. at 2766–67. This test is the appropriate one for application to this case, and Judge Jenkins thoroughly analyzed the facts of the instant case under the test. It is unnecessary for this Court to repeat the analysis here, as it finds Judge Jenkins' construction of the law and facts to be correct, and as plaintiff has not raised any challenge to Judge Jenkins' methodology as a whole.

Plaintiff's objections, while at times difficult to decipher, appear to be addressed mainly to the reliance of the Report and Recommendation on certain pieces of evidence. The first objection is to Judge Jenkins' consideration of the briefs and orders filed in two other Florida voting rights cases, *Nipper v. Chiles*, 795 F.Supp. 1525 (M.D.Fla. 1992), and *Davis v. Chiles*, 90–40098 MMP (N.D.Fla.). The plaintiff argues that the rulings of the courts in *Nipper* and *Davis* are not dispositive on the issue of Florida's allegedly discriminatory policy in Hillsborough County elections. The legal proposition set forth in this objection is correct; *Nipper* and *Davis* do not control the outcome of this case by issue or claim preclusion. The objection is nonetheless without merit, because Judge Jenkins did not give dispositive effect to either of these cases. The Report and Recommendation does not rely on *Davis* at all, and cites to *Nipper* only as persuasive authority on certain legal issues.

Plaintiff's next objection is that the Tenth Amendment, which reserves to the states all powers not delegated to the federal government by the Constitution, does not immunize Florida's judicial election system from federal constitutional review. Again, plaintiff's legal premise is correct, but his argument misplaced; the Report and Recommendation does not even address the Tenth Amendment. The third objection is that the proper test to be applied in the instant case is that set forth in *Gingles*. As Judge Jenkins did apply *Gingles*, this objection is without foundation.

Plaintiff also objects to Judge Jenkins' consideration of the 1990 election of Marva Crenshaw to the position of county judge.[1] Judge Crenshaw, a black, defeated a white candidate, winning 58.4% of the vote even though only 11% of the voters in that election were black. Plaintiff claims that this election "only showed further orchestration and manipulation by the white organizations and institutions, daily newspapers and media." He further argues that Crenshaw was not the choice of black voters, but rather was the choice of the "white power structure." This objection has no factual or legal basis; it is solely based on plaintiff's personal beliefs. Plaintiff appears to be arguing that any black candidate who is not elected by a majority of black voters is in some way illegitimate, as is the system leading to his or her election. No court has ever held in such a manner. Judge Jenkins did properly consider the election of Judge Crenshaw as relevant to the second and third *Gingles* factors, which regard racially polarized voting to be an indication of potentially discriminatory election systems.

The sixth objection to the Report and Recommendation argues that Florida's statewide merit retention election of all state trial judges indicates a refusal by the state "to share political power with the Black electorate." Plaintiff offers no reason why the retention election is relevant to Hillsborough County's election system. This Court does not find this election, even if accurately portrayed by plaintiff (who adduces no evidence in support of his claim) to be relevant to the instant suit. Therefore, this objection is without merit.

Plaintiff's final objection is to Judge Jenkins' interpretation of the "Harris Plan," a census tract plan of west-central Hillsborough County. This area of the county is 45.35% black, and plaintiff argues that it should be legislated as an electoral subdistrict. Judge Jenkins accurately pointed out the two essential flaws in the "Harris Plan". First, the census tract plan does not distinguish between black voters and black residents; the percentage of black voters in this area might well be substantially less than 45.35% Second, the number of blacks in this area comprise a plurality of the population, not a majority. These two flaws cause the "Harris Plan" to fail to meet the *Gingles* criteria that the minority group prove that it is of sufficient size to constitute a majority in a single-member district. 478 U.S. at 50, 106 S.Ct. at 2766.

For the reasons set forth above, plaintiff's objections to the Report and Recommendation are overruled, and the Report and Recommendation is approved and adopted.

AND IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

JENKINS, United States Magistrate.

THIS CAUSE comes on for consideration upon the memoranda submitted by the parties in support of their respective positions which the Court has considered as cross-motions for summary judgment.[1] The Magistrate Judge has considered the motions,[2]

---

1. Plaintiff also objects to "the use of Rev. Leon Lowry's election." The Report and Recommendation makes no mention of such an election. This objection is therefore frivolous on its face and need not be considered further.

1. This matter was specifically referred for report and recommendation to United States Magistrate Judge Charles R. Wilson by United States District Judge Clarence C. Newcomer, of the Eastern District of Pennsylvania sitting by designation (Dkt. 103). On February 18, 1993, the case was transferred to the undersigned Magistrate Judge following an order of recusal. (Dkt. 118)

2. Additionally, plaintiff filed a Motion for Judgment on the Pleadings (Dkt. 104). Pursuant to Rule 12(c), Fed.R.Civ.P., if matters outside the pleadings are included, then the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, Fed.R.Civ.P. Therefore, the Motion for Judgment on the Pleadings should be DENIED as both parties have relied on matters outside the pleadings.

the memoranda and supporting materials filed by both parties, and is otherwise fully advised in the premises. Based on the following findings of fact and conclusions of law, it is recommended that the defendants' motion be **GRANTED** and the plaintiff's motions be **DENIED**.

## I. Factual and Procedural Background

This cause was previously set for trial and after the pretrial conference was held, the Court entered a pretrial order. Thereafter, defendant Krivanek moved to strike the demand for jury trial, and the court determined that there were no issues to be decided by a trier of fact. Hence, the Court granted the motion to strike the jury demand. Thereafter, the parties were instructed to brief their positions and submit their memoranda to the Court. On November 8, 1990 the Court granted summary judgment in favor of the defendants and denied summary judgment in favor of plaintiff. (Dkt. 98)

The plaintiff appealed the denial of both motions. On appeal, the Court of Appeals for the Eleventh Circuit determined that the lower court improperly considered the briefs of the parties as motions for summary judgment without prior notice. The Eleventh Circuit vacated and remanded the case instructing the lower court to give proper notice as required by Rule 56, Fed.R.Civ.P. The parties were also given the opportunity to submit information that would demonstrate a genuine issue of material fact, in addition to any facts expressly stipulated by the parties. (Dkt. 101)

On remand, the Court invited the parties to submit additional information, notified them of its intent to enter summary judgment if no material issues of fact were raised, and referred the matter to the Magistrate Judge for report and recommendation. Thereafter, plaintiff filed a Motion for Judgment on the Pleadings and moved for leave to submit additional information or materials, which were attached to his motion (Dkt. 104). Magistrate Judge Wilson granted the motion to the extent that plaintiff was permitted to file the attached supplemental information

and the defendants were permitted to file the opposing legal briefs and court orders issued in the cases of *Nipper v. Chiles,* 795 F.Supp. 1525 (M.D.Fla.1992) and *Davis, et al. v. Chiles,* case No. 90–40098 MMP, (Northern District of Florida). (Dkt. 109)

On May 11, 1992, defendants filed results from the countywide election held on September 4, 1990 in which Judge Marva Crenshaw, a black, was elected county judge. Also, defendant has updated the facts previously agreed to by the parties based on 1990 census information. (Dkt. 105, Ex. A and B) Plaintiff has not moved to strike and has not otherwise challenged the material submitted by defendants. This information will therefore be considered for purposes of determining the issues presented.

### A. Contentions of the Parties

Marzuq A. Al–Hakim, the plaintiff, brings suit alleging that the existing at-large system of electing county and circuit judges in Hillsborough County, Florida, is discriminatory and has been applied to deprive blacks and other minorities of their right to fully participate in the electoral process and to elect judicial candidates of their choice. Plaintiff alleges that there are forty (40) circuit and county court judges in Hillsborough County, of whom four (4) are black, that no black candidate has ever won a contested election for circuit or county court judge, and that the current four black judges were initially gubernatorial appointees.[3]

Plaintiff contends that blacks and other minorities are hindered from electing a judicial candidate of their choice since the existing at-large system of election illegally and unconstitutionally dilutes black and other minority voting strength; additionally, he claims that white voters can vote as a bloc at will to defeat the black or other minority candidate, effectively disenfranchising black and other minority voters. Further, plaintiff maintains that the existing at-large system of electing judges was designed primarily for the purpose and intent of depriving black and

---

**3.** Subsequent to plaintiff's memorandum, general elections were held in Hillsborough County in 1990 and 1992. To the extent that the parties do not dispute the supplemental facts which they have each submitted, these facts will be considered in part B, *infra.* Neither party has submitted results of the 1992 general election.

other minority voters from exercising their constitutional, civil, and voting rights.

Plaintiff contends that Article V, section 10(b) of the Florida Constitution and its implementing statutes violate section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. Section 1973 *et seq.* (the Act), the Civil Rights Act of 1871, as amended, 42 U.S.C. section 1983, and the First, Fourteenth, and Fifteenth Amendments of the United States Constitution. Plaintiff seeks declaratory and injunctive relief, and demands trial by jury on all issues so triable.

The defendants, the State of Florida and Robin C. Krivanek, in her official capacity as Supervisor of Elections for Hillsborough County, Florida, respond that the existing method of electing circuit and county court judges in Hillsborough County, as established by Article V, section 10(b) of the Florida Constitution and implementing statutes, is not discriminatory in its intent or its effect. Defendants state that minorities, as a matter of law, are not entitled to proportional representations or to any specific number or percentage of elected judicial officials under the Act. Defendants contend that plaintiff and others similarly situated have an equal opportunity to participate in the political processes and to elect judicial candidates of their choice. Thus, defendants contend that the present at-large system of electing circuit and county court judges which is in place in Hillsborough County violates neither section 2 of the Act, section 1983 of the Civil Rights Act of 1871, nor any constitutional guarantee.

### B. Stipulated Facts

In February 1990, the parties filed unilateral pre-trial stipulations which contained, among other things, stipulated issues of fact. (Dkts. 67, 69) On March 19, 1990, the Court found that no additional facts remained to be litigated. (Dkt. 85)

The parties stipulated to the following facts:

1. Plaintiff Marzuq Al–Hakim is a black resident of Hillsborough County.

2. Defendant Robin Krivanek is the Hillsborough County Supervisor of Elections.

3. In 1988, the population of Hillsborough County was 825,411. **In 1990, the population of Hillsborough County was 834,054.**[4]

4. In 1988, 85.7% of the total Hillsborough County population was white and 14.3% was non-white. **In 1990, 82.8% of the Hillsborough County population was white and 17.2% was non-white.**

5. As of October 8, 1988, the total number of registered voters in Hillsborough County was 338,434. **As of May 3, 1992, the total number of registered voters in Hillsborough County was 309,814.**[5]

6. As of October 8, 1988, the total number of black registered voters was 37,995. **As of May 3, 1992, the total number of black registered voters was 31,033.**[6]

7. There are currently 208 voting precincts in Hillsborough County.

8. Of the 208 voting precincts, 20 precincts have more black voters than white. **21 precincts have more black voters than white.**

9. There is one black member of the Hillsborough County School Board who was elected countywide.

10. There is one black member of the Tampa City Council who was initially elected citywide.

11. There is one black member of the Hillsborough County Board of County Commissioners who was elected from a single-member district. When that district was created, it was 37% black by population.

12. There are approximately 2400 members of The Florida Bar in Hillsborough County.

4. At the time the parties stipulated to the facts, the 1990 population statistics from the Census Bureau were not available. Subsequently, defendants submitted the population statistics which appear in bold-type above. (Dkt. 105, Ex. B)

5. The biennial purge of inactive voters from the registration books required by § 98.081, Florida Statutes, was conducted in June, 1991. (Dkt. 105, Ex. B)

6. Based on facts 5 and 6, it can be concluded that black registered voters, as a percentage of all registered voters in Hillsborough County amounted to 11.2% in 1988 and to 10.02% in 1992.

13. There are approximately 60 blacks in Hillsborough County who are members of The Florida Bar. Of those, approximately 12 have been members for less than five years.

14. To be eligible for state judicial office, a lawyer must have been a member of The Florida Bar for five years.[7]

15. There are presently 40 circuit and county court judges in Hillsborough County. **There are presently 42 circuit and county court judges in Hillsborough County. One county court judgeship was vacant as of May 11, 1992.[8]**

16. There are presently four black circuit and county judges in Hillsborough County. **There are presently three black circuit and county judges in Hillsborough County.[9]**

17. In 1972 Warren H. Dawson, a black, ran for county court judge against Thomas A. Miller, a white; 43.8% of the vote went for Dawson even though only 9.4% of the voters who went to the polls in that election were black.

18. In the 1986 general election, one black county judge was elected without opposition.

19. In 1986 Fred L. Buckine, a black, ran for county court judge against Richard L. Lazzara, a white; 40.9% of the vote went for Buckine even though only 11% of the voters who went to the polls in that election were black.

20. In the 1988 general election, one black circuit judge and one black county judge were elected without opposition.

21. **In the 1990 general election, Marva Crenshaw, a black, was elected county judge with opposition. Judge Crenshaw defeated Doug Roberts, a white candidate. 58.4% of the vote went for Crenshaw even though only 11% of the voters who went to the polls in that election were black.[10]**

## C. Motion to Strike

■ Defendants have moved pursuant to Fed.R.Civ.P. 12(f) to strike from plaintiff's memorandum of issues and points of authorities certain allegations of fact not included within the stipulated facts agreed to by the parties and adopted by the Court in the pretrial order. In support of this motion, defendants point to Local Rule 3.06(e), which provides in pertinent part that:

"[t]he pretrial statement and the pretrial order ... will control the course of the trial and may not be amended except by order of the Court in the furtherance of justice. If new evidence or witnesses are discovered after filing of the pretrial statement, the party desiring to use the same shall immediately notify opposing counsel and the Court, and such use shall be permitted only by order of the Court in the furtherance of justice."

Plaintiff responds that the Court is being asked to strike matters which were agreed upon in the pretrial stipulation: the Dawson–Miller judicial election and Buckine–Lazzara judicial election. Plaintiff also contends that the Little–Kilgore judicial election and other related elections of historical significance are all relevant facts to be considered by the Court. Plaintiff asserts that consideration of these facts is helpful in light of the factors set forth in the Senate Report accompanying the 1982 Amendment to § 2 of the Act was extensively cited in the leading Supreme Court decision on § 2: *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

In this case, defendants have not shown that they will be unfairly prejudiced by denying the motion to strike. Accordingly, defendants' Motion to Strike (Dkt. 88) should be denied.

---

7. The parties also stipulated that where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task. *See Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). However, this is an issue of law rather than an issue of fact.

8. The results of the 1990 election and composition of the Hillsborough County bench are derived from defendant's submission dated May 11, 1992 and appear in bold-face above. (Dkt. 105, Ex. B)

9. Former county judge Charles R. Wilson, a black, is now a United States Magistrate Judge, Middle District of Florida.

10. See footnote 8, *supra.*

## II. Discussion

Plaintiff alleges that Florida's at-large system of electing judges, as provided in Article V, Section 10(b) of the Florida Constitution and its implementing statutes, violates § 2 of the Voting Rights Act, the Civil Rights Act, and the First, Fourteenth, and Fifteenth Amendments to the United States Constitution. Each claim will be addressed separately below.

### A. Appropriateness of Summary Judgment

■ Summary judgment may be entered only if the Court has determined "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F.R.Civ.P. 56(c). The party moving for summary judgment bears the burden of initially demonstrating that "the pleadings, depositions, answers to interrogatories, and admissions on file," together with the affidavits, if any, meet this test. An issue of fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). It is "genuine" if the record taken in its entirety could lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### B. Voting Rights Act Claim

Plaintiff claims that the Hillsborough County electoral system violates section 2 of the Voting Rights Act ("the Act").[11] The Act was substantially amended in 1982, largely in response to the Supreme Court's plurality opinion in *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which held that to prove a violation of § 2 of the Act or of the Fourteenth or Fifteenth Amendments, a plaintiff had to establish that the challenged electoral system was intentionally selected and sustained by state officials for a discriminatory purpose. *Id.* at 65–74, 100 S.Ct. at 1498–1503.

The 1982 amendment was intended to clarify that a § 2 violation could be proved by showing discriminatory effect alone without regard to intent and to establish as the relevant legal standard the "results test" which had been applied prior to *Mobile v. Bolden, supra. See Solomon v. Liberty County, Florida*, 899 F.2d 1012, 1015 (11th Cir.1990), *cert. denied*, 498 U.S. 1023, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991) (Kravitch, J., specially concurring).

The Supreme Court addressed the amendment to § 2 in a suit brought by black citizens of North Carolina challenging a redistricting plan including multimember districts for election of legislative representatives. *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

■ The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives. *Id.* at 47, 106 S.Ct. at 2764. While multimember districts and at-large voting schemes may impair the voting strength of racial minorities in the voting population, they are not *"per se* violative of minority voters' rights." *See Id.* at 48, 106 S.Ct. at 2765. Rather, a plaintiff must demonstrate that under the "totality of the circumstances", the challenged structure

---

11. Section 2(a) provides as follows:

    No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973(f)(2) of this title, as provided in subsection (b) of this section.

    Section 2(b) provides as follows:

    A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

or device results in unequal access to the electoral process. *Id.* at 46, 106 S.Ct. at 2764.

The Court reviewed the extensive legislative history of the amendment as reflected in Senate Report No. 97–417 (1982) (Senate Report), U.S.C.C.A.N. 1982, p. 177 which underscored the importance of reviewing a § 2 claim on the basis of objective factors, including:

the history of voting related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Gingles, supra* at 44–45, 106 S.Ct. at 2763.

■ Additional relevant factors may include whether elected officials are unresponsive to the particularized needs of the members of the minority group and the policy reason underlying the political subdivision's use of the challenged practice is tenuous. *Id.* at 45, 106 S.Ct. at 2763–64. The Senate Report stated that the list of factors was neither comprehensive nor exclusive. There is "no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." Rather, "the question whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality' ... and on a "functional" view of the political process." *Ibid.* (citing Senate Report), U.S.C.C.A.N. 1982, p. 208.

■ Notwithstanding the many factors addressed in the Senate Report, the *Gingles*

Court identified three "necessary preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice": (1) the minority group must demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group must be able to show that it is politically cohesive; and, (3) the minority group must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred. *Id.* at 50–51, 106 S.Ct. at 2766–67.

The Eleventh Circuit Court of Appeals has not reached a consensus on the interpretation to be given to *Gingles*. The Eleventh Circuit sitting *en banc* in *Solomon, supra*, agreed that the plaintiffs in that case had satisfied the three-part test set out in *Gingles, supra*. *Solomon*, 899 F.2d at 1013. However, the appellate court was evenly divided on the meaning of *Gingles* and the plaintiff's burden of proof in establishing a § 2 violation. *Id.*

Chief Judge Tjoflat and Judge Kravitch each specially concurred. Judge Kravitch concluded that as a matter of law the plaintiffs had satisfied the three part test set out in *Gingles* and that the other factors identified in the Senate Report were merely supportive, but not essential to, a vote dilution claim. Thus, Judge Kravitch determined that satisfaction of the three *Gingles* factors was "necessary and, in this case, sufficient" to prove a claim of vote dilution under § 2 of the Act. *Id.* at 1017.

Judge Tjoflat disagreed, concluding that satisfaction of the three *Gingles* factors is a necessary threshold requirement but is not sufficient to establish a violation unless the defendant offers nothing to rebut the plaintiffs' claim. Thus, "if the defendant can affirmatively show that the 'social and historical conditions' are such that their interaction with the scheme will not result in voting discrimination, (citation omitted), the plaintiff cannot prevail." *Id.* at 1035. (Tjoflat, J. concurring).

In 1991, the Supreme Court held that § 2 applies to the election of state trial judges. *Chisom v. Roemer,* 501 U.S. 380, 403–04, 111 S.Ct. 2354, 2368, 115 L.Ed.2d 348 (1991) In a companion case, the Court held that the state's interest in maintaining an at-large, district wide electoral scheme for single-member offices is merely one factor to be considered in evaluating the "totality of circumstances" in determining whether a § 2 violation has occurred. *Houston Lawyers' Assoc. v. Attorney General,* 501 U.S. 419, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991).

Thus, the *Gingles* criteria are applicable to a challenge to the at-large system of electing judges which exists in Florida today. *See Nipper, supra,* at 1532.

In this case, plaintiff has failed to adduce evidence which creates a genuine issue of material fact as to the three threshold criteria of *Gingles.* This deficiency is fatal to his claim of vote dilution under the Act.

█ Although the stipulated facts might support a conclusion that blacks and other minorities make up a significantly large portion of the voting age population—11.2% in 1988 and 10.02% in 1992—plaintiff has not demonstrated that blacks are a geographically cohesive or compact group which could command a majority in a subdistrict.[12]

While black registered voters may comprise a majority of the voters in approximately 10% of the voting precincts in Hillsborough County, there is no evidence before the Court that the precincts are geographically contiguous and could form a subdistrict.

Plaintiff has proffered that a subdistrict consisting of a "plurality" of black residents (45.35%) could be created in west-central Hillsborough County based on a "1990 Census Tract Map (Harris Plan)" for Hillsborough County. (Dkt. 104, Attachment).

█ There are several problems with plaintiff's proffer. First, it is not clear whether the 1990 Census Tract Map identifies black voters (or voting age population) or merely all black residents of the proposed subdistrict. If the latter, its probative value is slight:

> Only voting age persons can vote. It would be a pyrrhic victory for a court to create a single-member district in which a minority population dominant in absolute, but not voting age numbers, continued to be defeated at the polls.

*Overton v. City of Austin,* 871 F.2d 529, 542 (5th Cir.1989) (Jones, J., concurring). As Judge Jones noted in her concurring opinion in the *Overton* case, courts addressing this issue have concluded that the first prong of a § 2 claim refers to a majority voting age population in a proposed single-member district. *Id.* at 542 (citing cases). *See also Meek v. Metropolitan Dade County,* 908 F.2d 1540, 1546 and nn. 5–6 (11th Cir.1990), *cert. denied,* 499 U.S. 907, 111 S.Ct. 1108, 113 L.Ed.2d 217 (1991) (evidence of minority voting age population is critical factor).

Even if the 1990 Census Report referred to a black voting age population of 45.35%, not merely black residents, there is a more fundamental problem: a plurality is not a majority. *Gingles* explicitly requires a minority group "to demonstrate that it is sufficiently large and geographically compact to constitute a *majority* in a single-member district." *Gingles, supra,* 478 U.S. at 50, 106 S.Ct. at 2766 (emphasis added) (footnote omitted).

Thus, neither the stipulated facts nor plaintiff's proffer establishes that a subdistrict composed of a majority of black voters is demographically possible in Hillsborough County. *Compare e.g. Nipper, supra,* at 1533 (plaintiffs met first *Gingles* factor in presenting testimony from expert demographer drawing a subdistrict 60% black in voting age population).

█ Plaintiff's inability to meet the first of the three necessary preconditions identified in *Gingles* is dispositive of his § 2 claim. However, plaintiff has also failed to meet his burden as to the second and third factors identified in *Gingles.* Generally,

---

**12.** Plaintiff's § 2 claim is premised on the theory that the at-large electoral system has made it difficult for blacks to elect judicial candidates of their choice. The Supreme Court has not decided whether § 2 encompasses a claim that a voting practice impairs a minority's ability to influence, rather than alter, election results. *See Growe v. Emison,* —— U.S. ——, ——, n. 5, 113 S.Ct. 1075, 1084, n. 5, 122 L.Ed.2d 388 (1993).

these two factors are established by statistical evidence of racially polarized voting by the voters in the relevant political unit. *Westwego Citizens For Better Government v. Westwego*, 872 F.2d 1201, 1206 (5th Cir.1989). Evidence of racially polarized voting is considered to be the "linchpin of a section 2 vote dilution claim." *Id.* at 1207. Such evidence is essential to a plaintiff attempting to establish political cohesiveness among minority voters and the white majority's ability to defeat the minority's preferred candidate. Plaintiff has presented no expert testimony on these *Gingles* factors as well.

The undisputed facts address three contested judicial elections in 1972, 1986, and 1990 involving a black candidate and white candidate.[13]

In 1972, Warren H. Dawson, a black, opposed Thomas S. Miller, a white, for a county judge seat. Although Dawson was defeated, he won 43.8% of the votes even though only 9.4% of the voters were black.

In 1986, Fred L. Buckine, a black, ran for a county judge seat against Richard Lazzara, a white. Buckine was defeated. However, 40.9% of the votes were for Buckine although only 11% of the voters were black.

In 1990, Marva Crenshaw, a black, defeated Doug Roberts, a white, for a county judge seat. Crenshaw obtained 58.4% of the vote; 11% of the voters were black.

In addition, plaintiff has proffered evidence concerning a 1976 election for a county judge seat involving Perry A. Little, a black, and Don Kilgore, a white, who won 47,093 of the votes to Little's 25,456 votes. Plaintiff states that in the fourteen (14) predominantly black precincts, Little out-polled Kilgore by a vote of 6,333 to 1,037 but won 19,123 votes in the other precincts, primarily white-dominated. (Dkt. 87, p. 3). Plaintiff has not identified the percentage of voters in the 1976 election who were black. However, based on the plaintiff's figures, it appears that approximately 35% of the votes cast in that election were for Little. (Dkt. 87, p. 3–4)[14]

Additionally, a total of three black candidates were elected to county and circuit judge seats in 1986 and 1988 when they ran without opposition.[15] Further, it is undisputed that one black member of the school board was elected in a county-wide election and that a black county commissioner member was elected from a single-member district which was 37% black by population. Also, one black candidate was elected to the city council in a city race.

■ A plaintiff may show that black voters are politically cohesive "if a significant number of minority group members usually vote for the same candidate." *Gingles, supra,* at 56, 106 S.Ct. at 2769. "The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Id.* Political cohesiveness may be shown by evidence that "a significant number of minority group members usually vote for the same candidates"; and a legally significant "white bloc vote will normally defeat the combined strength of minority support plus white 'crossover' votes." *Id.*

Evaluating a § 2 vote dilution claim under the second and third *Gingles* factors necessarily involves an examination of minority and white voting practices in the locale in question in light of a number of factors such as potentially dilutive electoral mechanisms, percentage of minority registered voters, district size, number of seats, and number of candidates in the field. *Id.* at 56–57, 106 S.Ct. at 2769–70.

In this case, plaintiff has not submitted any expert or anecdotal evidence on white and black voting practices in Hillsborough

---

**13.** Both parties have focused on judicial races involving black rather than other minority candidates.

**14.** Although defendants have moved to strike plaintiff's reliance on facts not previously agreed to in the pretrial stipulations, the 1976 Kilgore—Little race will be considered for the reasons stated previously in Section C, *supra.*

**15.** Admittedly, a candidate running in an election unopposed constitutes a special circumstance with regard to factor three of the *Gingles* test. *See Gingles, supra,* at 51, 106 S.Ct. at 2766–67.

County. Moreover, the undisputed facts, for the most part, simply focus on the results of contested judicial elections involving run-offs between black and white candidates and the percentage of black voters voting in the elections. *Compare e.g. Nipper, supra,* at 1540 (expert testimony as to statistical regression estimates and extreme case analysis ordinarily would be sufficient showing of racial polarization except that judicial races analyzed were stale).

■ Nothing approaching the statistical evidence presented in other cases has been submitted in this case, by either party. *See e.g., Gingles, supra,* 478 U.S. at 58–61, 106 S.Ct. at 2770–72; *Lucas v. Townsend,* 967 F.2d 549, 551–553 (11th Cir.1992); *Carrolltown Branch of NAACP v. Stallings,* 829 F.2d 1547, 1556–1559 (11th Cir.1987), *cert. denied, sub. nom. Duncan v. Carrollton,* 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988). As plaintiff has the burden of proof in proving the three *Gingles* preconditions of his § 2 vote dilution claim,, this deficiency in the evidence is fatal to his cause of action. *See Growe v. Emison,* —— U.S. ——, ——, 113 S.Ct. at 1075, 1085, 122 L.Ed.2d 388 (1993) (absence of statistical or anecdotal evidence of racial bloc voting under *Gingles* fatal to plaintiff's § 2 challenge to state redistricting plan).

The fact that black candidates have won contested county-wide races or have received a substantial percentage of the vote in Hillsborough County elections seriously undercuts plaintiff's argument that whites vote sufficiently as a bloc to defeat the minority's preferred candidate in Hillsborough County. Given the sparse record before the court as to contested judicial elections, it is proper to consider the electoral success of blacks in non-judicial races in Hillsborough County, such as the school board and county commission. *See e.g. Citizens for a Better Gretna v. City of Gretna,* 834 F.2d 496, 502–503 (5th Cir.1987), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989); *Westwego, supra,* at 1208–1209. The conclusion which must be drawn from the facts submitted is that plaintiff has been unable to show that blacks have been politically cohesive and that the white majority votes in a bloc so as to usually defeat the minority candidate in Hillsborough County in the recent past.

Hence, factors two and three of *Gingles* have not been established.

Because plaintiff has not met the three necessary *Gingles* preconditions, the other factors relevant to determining a § 2 vote dilution claim need not be addressed and defendants are entitled to summary judgment on plaintiff's § 2 claim.

### C. Constitutional and Section 1983 Claims

■ The plaintiff has also alleged that the present electoral system in Hillsborough County violates the First, Fourteenth and Fifteenth Amendments to the United States Constitution. With regard to plaintiff's constitutional claims, "a determination of discriminatory intent is 'a requisite to a finding of unconstitutional vote dilution' under the Fourteenth and Fifteenth Amendments." *Rogers v. Lodge,* 458 U.S. 613, 621, 102 S.Ct. 3272, 3277, 73 L.Ed.2d 1012 (1982) (citation omitted). *Accord Carrollton Branch of NAACP v. Stallings,* 829 F.2d at 1552; *Nipper, supra,* at 1549.

■ A prima facie case of discriminatory intent is established by showing, "first, that racial discrimination was a 'substantial' or 'motivating' factor behind the enactment or maintenance of the electoral system and, second, that the system continues today to have some adverse racial impact.'" *Dillard v. Baldwin County Board of Education,* 686 F.Supp. 1459, 1467 (M.D.Ala.1988), citing *Hunter v. Underwood,* 471 U.S. 222, 228, 105 S.Ct. 1916, 1920, 85 L.Ed.2d 222 (1985). "This impact may be met by *any evidence* that the challenged system is having significant adverse impact on black persons today." *Dillard,* 686 F.Supp. at 1467–1468 (emphasis in original). If these two elements are established, the burden "then shifts to the scheme's defender to demonstrate that the scheme would have been enacted without the purposefully discriminating factor." *Dillard,* 686 F.Supp. at 1468, citing *Hunter,* 471 U.S. at 228, 105 S.Ct. at 1920; *see also Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

Plaintiff has also alleged that the electoral system in Hillsborough County also violates 42 U.S.C. § 1983. Defendant Krivanek concedes that, as Supervisor of Elections in Hillsborough County, she is not entitled to Eleventh Amendment immunity from injunctive relief for her executive actions, but submits that she may be enjoined for such actions only if plaintiff can establish the violation of some federal statutory or constitutional right which would allow him relief under § 1983.

In the instant action, plaintiff has failed to meet his burden of showing disputed issues of material fact as to whether the at-large system of electing circuit and county judges in Hillsborough County violates the First, Fourteenth, or Fifteenth Amendments to the Constitution or § 1983.[16]

There is no evidence in the record before this Court that the existing system was contrived for a discriminatory purpose or that its operation has denied plaintiff his rights guaranteed under the Constitution. Nor has plaintiff presented evidence creating a genuine factual issue as to whether the current electoral system has a continuing adverse racial impact today. Therefore, defendants are entitled to summary judgment on this issue as well. *See Nipper, supra,* at 1548–1550.

### Conclusion

Defendants are entitled to summary judgment as plaintiff has failed to fulfill his burden under the *Gingles* test. Further, plaintiff offered no evidence that the current system of electing judges was conceived or maintained for a discriminatory purpose so as to justify relief on the remaining claims. Therefore, I recommend that:

1. Defendants' motion for summary judgment be **GRANTED.**

2. Plaintiff's motion for summary judgment and motion for judgment on the pleadings (Dkt. 104) be **DENIED.**

---

16. Plaintiff has not articulated the basis of his First Amendment challenge to the at-large system of electing trial judges in Hillsborough County. Certain electoral procedures may impinge on First Amendment rights. *See e.g., Meyer v. Grant,* 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) (Colorado statute prohibiting

So recommended in Chambers at Tampa, Florida, this 30th day of April, 1993.

### NOTICE TO PARTIES

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date it is served on the parties shall bar an aggrieved party from a *de novo* determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02; *Nettles v. Wainwright,* 677 F.2d 404 (5th Cir.1982) (en banc).

use of paid circulators to gather signatures on an initiative petition violated the First and Fourteenth Amendments). However, no inference can be drawn from the stipulated facts that plaintiff's First Amendment rights have been violated by the at-large system of electing trial judges in Hillsborough County.